**SIGNED THIS: October 25, 2010**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SHARA MANNING PROPERTIES, INC., | ) | No. 09-83006 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| BANK OF ILLINOIS, n/k/a HEARTLAND BANK and TRUST COMPANY, an Illinois state bank, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adv. No. 09-8121 |
| | ) | |
| CHARLES E. COVEY, Trustee, SHARA MANNING PROPERTIES, INC., INTERNAL REVENUE SERVICE of the UNITED STATES of AMERICA, and EASTERN TAZEWELL DEVELOPMENT CO., | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| EASTERN TAZEWELL DEVELOPMENT CO., | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BANK OF ILLINOIS, an Illinois state bank, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

## **O P I N I O N**

This adversary proceeding involves a priority dispute between two mortgagees and the IRS. The first to record was Bank of Illinois, n/k/a Heartland Bank and Trust Co. ("BOI"). The IRS recorded second. Third to record was Eastern Tazewell Development Co. ("ETDC"). The mortgages of both BOI and ETDC are challenged, each by the other.

## **FACTUAL AND PROCEDURAL BACKGROUND**

The Debtor, Shara Manning Properties, Inc. ("SMPI"), owned and operated by Shara Manning, was a developer of residential real estate. It developed Wyndhill Estates, consisting of 26 acres of Peoria County real estate originally divided into 7 lots. The largest, Lot 7, consisting of 8.605 acres, was designated on the first plat recorded October 19, 2005, to become a "14 unit residential cluster development." As reflected on the final plat recorded April 18, 2007, Lot 7 was subdivided into 12 building lots and several outlots, all connected by a common private access road called Wyndhill Lane. Of the 12 building lots, Lot 1 was designated 8515 North Wyndhill Lane, Peoria, Illinois.

SMPI intended to build a spec house on building Lot 1. "Spec" is short for speculation. Developers often sell empty building lots and allow buyers to build houses of their own design. A spec house is one built by the developer in the hope of selling the completed but unoccupied new house to a buyer who is satisfied with the developer's design. The reward on a spec house can be greater since a margin of profit is applied to both the cost of the lot and the cost of construction. But the risk is greater too since the developer usually fronts the cost of construction through an interest bearing loan that won't be paid until the house sells.

In July, 2006, SMPI obtained a loan from BOI to build a spec townhome on Lot 1. The promissory note, dated July 6, 2006, states that the loan amount of $455,000 was to be paid out in multiple advances in accordance with the terms and conditions of a construction loan escrow agreement. Interest accrued at a fixed rate for one year at 8.25%, then floated, although the note stated a six-month maturity date of January 6, 2007. As security, the note references a mortgage on 8515 N. Wyndhill Lane. The note bears loan no. 337798-53784.

The corresponding real estate mortgage is dated July 5, 2006, and was recorded on July 7, 2006, in the office of the recorder of deeds for Peoria County. The mortgage identifies Debtor as mortgagor, BOI as lender, and the property as 8515 N. Wyndhill Lane. In paragraph 3, the mortgage describes the secured debt as debt incurred under "Note #337798-53784 to Bank of Illinois from Shara Manning Properties, Inc., in the amount of $455,000, signed and dated on 07-6-2006." In paragraph 26, the figure $569,000 is inserted as the maximum obligation limit. The legal description of the mortgaged property, attached as Exhibit A to the mortgage, describes part of Lot 7 in Wyndhill Estates, commonly known as 8515 N. Wyndhill Lane, and references Tax I.D. Nos. 14-04-176-004, 14-04-302-016, 14-04-155-014 and 14-04-155-015.

BOI concedes that the legal description and the tax I.D. numbers do not correctly match up with the common address. The stated legal description describes the entirety of Lot 7, the 14 unit residential cluster development that was 8.605 acres of Wyndhill Estates as shown on the first plat. The common address, 8515 N. Wyndhill Lane, is that of the spec townhome built on Lot 1 (.33 acres) of Wyndhill Estates Townhome Subdivision identified on the final plat.

3

When the note matured on January 6, 2007, it was not paid. BOI agreed to extend the due date and required SMPI to execute a renewal note. The renewal note, dated January 6, 2007, bearing the same loan number as the initial note and stating the same loan amount of $455,000, states a maturity date of January 6, 2008. As security, the renewal note identifies the same mortgage dated July 6, 2006, on 8515 N. Wyndhill Lane.

Three months after the renewal note was executed, the final plat of Wyndhill Estates Townhome Subdivision was recorded, on April 18, 2007, showing the exact location and configuration of the building lots and outlots for the townhome subdivision. When the renewal note matured on January 6, 2008, it was not paid.

At some point, it came to BOI'S attention that Lot 1 of the subdivision had been assigned a new, separate tax I.D. number as well as a specific legal description. Since the July 5, 2006, mortgage contained a broader legal description and different tax I.D. numbers, BOI decided that a new mortgage should be prepared and recorded and the old mortgage released.

BOI prepared a new mortgage and caused it to be executed by SMPI on August 8, 2008. Its legal description describes Lot 1 of Wyndhill Estates Townhome Subdivision, with the tax I.D. number stated as 14-04-178-005. There is no dispute that the legal description and tax I.D. number are correct. The replacement mortgage was recorded August 11, 2008. That same day, a Release of Mortgage was also recorded identifying the prior mortgage, dated July 5, 2006, and releasing BOI'S lien on part of Lot 7 in Wyndhill Estates.

Unlike the old mortgage's specific description of the secured note, the new mortgage

4

cryptically describes the secured debt as "Bank of Illinois Note." Like the old mortgage, the new one also states a maximum obligation limit in paragraph 26 in the reduced amount of $455,000, the principal amount of the matured renewal note. According to ETDC, the dispute centers around the adequacy of these provisions.

On December 22, 2008, the ubiquitous Internal Revenue Service recorded a Notice of Federal Tax Lien issued against SMPI in the Peoria County Recorder's Office, for an assessed and unpaid liability of $13,361.70. Also in December, 2008, BOI decided that since the renewal note had still not been paid, a written agreement to extend the maturity date was warranted.[1] Rather than a second renewal note, however, BOI prepared a document entitled Modification of Note and Mortgage providing for a new maturity date of April 15, 2009. The document was executed by SMPI and BOI on December 29, 2008. Prepared in recordable format, it was recorded in the Peoria County Recorder's Office but, because of an oversight, not until March 20, 2009. The delay gave rise to the priority dispute.

In that relatively brief three-month gap, in jumped ETDC. By way of background, William Embry, one of two 50% owners of ETDC, was acquainted with Shara Manning, SMPI'S president and principal owner. After explaining her financial troubles to Embry, Shara suggested that she was willing to partner with investors to build houses on the lots in Wyndhill Estates in exchange for up-front money that would be used to pay off BOI. Embry at first agreed to have ETDC buy one of the lots for $100,000. Subsequently, mainly for tax reasons, he decided that it would be better for ETDC to loan the funds to SMPI and

---

[1] The evidence in the record reflects that BOI was continuing to pressure SMPI to pay the overdue note. Apparently not having the money to do so, as the spec townhome remained unsold, Shara Manning was putting off BOI through promises of obtaining a "take-out" loan from a new lender.

take back two mortgages for security.

Embry and Shara agreed that ETDC would be given a first mortgage on Lot 11 and a second mortgage on Lot 1, improved with the spec townhome. Shara advised Embry of the filed tax lien, but promised to use ETDC'S funds to pay it off. Recording of the second mortgage on Lot 1 was to be delayed until Shara obtained refinancing to take out BOI and the new lender had recorded its first mortgage.

On October 7, 2008, SMPI and Shara, as co-obligors, signed a promissory note to ETDC in the amount of $100,000 plus interest. On February 4, 2009, Shara executed a mortgage in favor of ETDC on Lot 1 to secure the $100,000 note. The "Borrower" is identified as "Shara Manning Properties, Inc., an Illinois Corporation, and Shara Manning, individually." The mortgage bears one signature, that of Shara Manning; below the signature line appears the designation "Borrower." The mortgage was recorded on February 18, 2009, a month prior to BOI'S recording of the modification agreement.

BOI'S complaint, sounding as one for declaratory judgment, asks the Court to determine that BOI'S mortgage recorded on August 8, 2008, is valid, prior and superior to the lien claims or interests of ETDC, the IRS and the Trustee in bankruptcy. The complaint admits that the mortgage's identification of the secured indebtedness as "Bank of Illinois Note" was a clerical error in that it "failed to include that the Note was dated January 6, 2007 for Loan No. 337798-53784." The prayer for relief also requests the Court, "if necessary, to correct the clerical error through reformation of the Mortgage to reflect a more detailed description of the Promissory Note secured thereby." The complaint also requests that the Court determine ETDC'S mortgage to be invalid, alleging that the "document does not contain the signature of Shara Manning Properties, Inc., as mortgagor, as required by

6

law."

ETDC denies that BOI'S August 8, 2008, mortgage, recorded August 11, 2008, is valid, and denies that the Modification recorded March 20, 2009, served to cure the defective mortgage. With respect to its own mortgage, ETDC asserts that it is valid. ETDC also pleads a counterclaim, alleging that BOI'S mortgage is invalid as a matter of law because it fails to state the principal amount of the debt, the interest rate and the maturity date. The counterclaim alleges that the Peoria County Circuit Court previously adjudicated the validity of BOI'S mortgage, determining that it does not substantially comply with the statutory requirements of 765 ILCS 5/11 and is not a "proper" mortgage. The state court order, attached as an exhibit to ETDC'S counterclaim, further determines that BOI'S mortgage modification cures the mortgage's deficiencies, but not retroactively, giving it priority over any interest filed *after* the mortgage modification was recorded.

In its answer to ETDC'S counterclaim, BOI denies that the debt amount is omitted, admits that the interest rate and maturity date are omitted, but denies that Illinois law requires a mortgage to state the note's interest rate or maturity date. BOI also moved to strike the paragraph of ETDC'S counterclaim that alleges the state court ruling, as well as the copy of the state court order attached as an exhibit. BOI alleged that the state court's order, and the findings and rulings therein, are immaterial because the order did not embody a final judgment. On January 14, 2010, the Court granted the motion to strike; so the state court order is accorded no preclusive effect.

The Trustee did not answer BOI'S complaint and stands in default. The IRS answered, denying its tax lien is subordinate and seeking a determination that its lien is

valid and superior to all other liens. BOI filed a motion for summary judgment and that motion is now before the Court. ETDC responded to the motion and the issues have been fully briefed by BOI and ETDC. The issue of the validity and priority of the IRS lien is not at issue herein and is reserved for subsequent determination.

As a final prefatory comment, BOI and ETDC raise and respond to a number of alternative theories of attack and of defense. Because this Court's decision turns on the simple fact of ETDC'S (through Embry's) actual knowledge of BOI'S mortgage, it is not necessary to address most of the arguments and rebuttals raised in the very thorough briefs filed by those parties.

## ANALYSIS

The year before Abraham Lincoln's first inauguration, the Illinois Supreme Court announced the rule that if a mortgage is given to secure an ascertained debt, the amount of the debt should be stated in the mortgage. *Metropolitan Bank v. Godfrey,* 23 Ill. 579, 1860 WL 6314 at *15 (Ill. 1860). Lawyer Lincoln would be chagrined to learn that a century and a half later, the application of the rule remains unclear. Contrary to ETDC'S position, however, this case does not turn on application of this rule.

**A. Applicable Statutes and Principles of Notice**.

The form and effect of a mortgage on real estate is addressed in section 11 of the Illinois Conveyances Act which provides, in pertinent part, as follows:

> Mortgages of lands may be substantially in the following form:
>
> The Mortgagor (here insert name or names), mortgages and warrants to (here insert name or names of mortgagee or mortgagees), to secure the payment of (here recite the nature and amount of indebtedness, showing when due and the rate of interest, and whether secured by note or otherwise), the following described real estate (here insert description

8

 thereof), situated in the County of ..., in the State of Illinois.

  Dated (insert date).

   (signature of mortgagor or mortgagors)

 The names of the parties shall be typed or printed below the signatures. Such form shall have a blank space of 3 ½ inches by 3 ½ inches for use by the recorder. However, the failure to comply with the requirement that the names of the parties be typed or printed below the signatures and that the form have a blank space of 3 ½ inches by 3 ½ inches for use by the recorder shall not affect the validity and effect of such form.

 Such mortgage, when otherwise properly executed, shall be deemed and held a good and sufficient mortgage in fee to secure the payment of the moneys therein specified; and if the same contains the words "and warrants," the same shall be construed the same as if full covenants of ownership, good right to convey against incumbrances of quiet enjoyment and general warranty, as expressed in Section 9 of this Act were fully written therein; but if the words "and warrants" are omitted, no such covenants shall be implied.

765 ILCS 5/11.

 The effect of recording is addressed in section 30 of the Conveyances Act, as follows:

 All deeds, mortgages and other instruments of writing which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record.

765 ILCS 5/30.

 It must be recognized that Illinois is a race-notice jurisdiction. *Davis v. U.S.*, 705 F.Supp. 446, 450 (C.D.Ill. 1989). So it is not the first to record, but the first to record without notice of a prior encumbrance who achieves priority. The kind of notice that can deprive a transferee of that protection includes actual, constructive and inquiry notice. *Equitable Real Estate Investments, Inc. v. U.S. Dept. of Housing & Urban Dev.*, 14 F.Supp.2d 1058, 1062 (N.D.Ill. 1998) (Illinois law). Constructive notice is notice that is deemed to be provided

by an instrument of conveyance that is both sufficient in substance and properly recorded in the statutory office designated to maintain land title records for the county in which the subject real estate is located. Thus it is said that a purchaser or encumbrancer of land has a duty to examine the record of the chain of title and is chargeable with notice of whatever is shown by that record. *Clark v. Leavitt,* 335 Ill. 184, 190, 166 N.E. 538 (1929). Even if he fails to search the real estate records, and is without actual knowledge of a prior properly recorded instrument, the subsequent transferee is deemed to be on notice of the instrument by operation of the principle of constructive notice.

But actual knowledge of a prior mortgage interest prevents a subsequent mortgagee from taking free and clear of the prior mortgage, regardless of whether or not the subsequent mortgagee may be deemed to be on constructive notice by virtue of its recording. Proof of actual knowledge makes the constructive notice inquiry unnecessary.[2] Simply put, a transferee has actual knowledge of a prior interest when he is aware of its existence. Inquiry notice is a different point on the same continuum. Inquiry notice describes the situation where the transferee has been made aware of facts or circumstances from which the existence or possibility of a prior claim might reasonably be inferred. If so, the purchaser then has a duty to verify or dispel the inference through further inquiry. If he fails to make inquiry, he is nonetheless chargeable with knowledge of facts that a diligent inquiry would have disclosed, the same as if he had acquired actual knowledge of those facts. *Smith v. Grubb,* 402 Ill. 451, 464, 84 N.E.2d 421 (1949). A transferee gains no cover by adopting a devil may care attitude. He must act with caution and prudence such

---

[2]This is not to say that a subsequent transferee's actual knowledge must be examined first. Adequate proof of constructive notice eliminates the issue of actual knowledge. Either by itself is sufficient to cause the interest of the subsequent transferee to be subject to the prior interest.

that every unusual circumstance is a ground of suspicion that demands investigation. *Reed v. Eastin,* 379 Ill. 586, 592, 41 N.E.2d 765 (1942).

Section 30 of the Conveyances Act codifies these principles by providing that an unrecorded instrument is "void as to all...creditors and subsequent purchasers, without notice." In other words, an instrument that is not properly recorded provides no constructive notice and so is ineffective against a subsequent transferee who does not otherwise have actual or inquiry notice of the instrument or the interest conveyed thereby. So a subsequent transferee who attacks a prior instrument as ineffective to accord constructive notice may still lose a priority battle if he had actual or inquiry notice of the instrument or the interest conveyed thereunder.

## B. Validity of ETDC'S Mortgage.

In an effort to hoist ETDC by its own petard, BOI attacks ETDC'S mortgage as invalid for lack of proper execution. It maintains that the single signature of Shara Manning, without designation as an agent of SMPI, is ineffective to constitute a proper grant of conveyance by SMPI, the owner of the real estate. The mortgage is a Fannie Mae/Freddie Mac Uniform Instrument that bears the printed designation "Borrower" under the signature line upon which Manning's signature is affixed. The mortgage sets out sixteen defined terms, including "Borrower" which is defined as "Shara Manning Properties, Inc., an Illinois Corporation and Shara Manning, individually. Borrower is the mortgagor under this Security Instrument."

It is generally accepted as a matter of contract interpretation that where a term is defined in a contract, the term will be accorded that meaning wherever it appears. *Alexian*

11

*Bros. Health Providers Ass'n, Inc. v. Humana Health Plan, Inc.,* 330 F.Supp.2d 970, 975 (N.D.Ill. 2004) (parties to a contract may serve as their own lexicographers and may assign a particular meaning to any word they choose). BOI cites no authority, and this Court is aware of none, that limits that principle in the context of a signature capacity designation.

The use of the defined term "Borrower" under Manning's signature line is to be accorded the same meaning and effect as if the term's definition was fully set forth. In this Court's view, it is clear and unambiguous that Shara Manning signed the mortgage on behalf of SMPI and for herself, individually, as well. There is no dispute that she was authorized to execute the instrument for SMPI, so the single signature operated to bind SMPI and herself, individually. The lack of ambiguity renders parol evidence unnecessary. *See Zahl v. Krupa,* 365 Ill.App.3d 653, 659-60, 850 N.E.2d 304 (Ill.App. 2 Dist. 2006). Even if admissible, all of the parol evidence in the record supports the conclusion that Manning intended her signature on the mortgage to be an act of authentication and conveyance on behalf of SMPI.

BOI also challenges the effect of the execution on behalf of SMPI for its failure to designate Manning's corporate office or agency. No such rule exists in Illinois. To the contrary, the signature of a corporate officer is sufficient to bind the corporation even if the officer fails to indicate his corporate affiliation if it was the intention of the parties to bind the corporation. *McCracken & McCracken, P.C. v. Haegele,* 248 Ill.App.3d 553, 561, 618 N.E.2d 577 (Ill.App. 1 Dist. 1993). Based upon the instrument's definition of "Borrower," it is clear from the face of the unambiguous document that the parties intended to bind SMPI; Manning's signature was effective to do so.

12

**C. ETDC'S Actual Knowledge.**

BOI contends that the issue of the adequacy of the disputed mortgage instrument (and whether it provided constructive notice) is superceded by the fact that ETDC had actual knowledge of the BOI mortgage prior to the time that ETDC'S mortgage was recorded in February, 2009. The Court agrees with BOI.

When Embry agreed to have ETDC loan SMPI $100,000, in consideration for a first mortgage on Lot 11, and a second mortgage on the spec townhome on Lot 1, he was aware that BOI held a first mortgage on Lot 1 and that it was also encumbered with a federal tax lien.[3] Shara's plan, as told to Embry, was to obtain a take out loan from Busey Bank to pay off the tax lien and BOI. Busey would take a first mortgage on Lot 1 and ETDC would then record its second mortgage. Embry believed that if that plan played out, ETDC'S second mortgage would be secured by at least $30,000 and possibly up to $200,000 of equity in the spec townhome.

Shara prepared the mortgage on Lot 1 herself, signed it on February 4, 2009, and recorded it on February 18, 2009. ETDC did not obtain a lien search or title insurance. Based on Shara's actions, Embry merely assumed that SMPI had obtained refinancing and that BOI was out of the picture, an assumption that turned out to be incorrect.

Embry testified that he first learned there was a problem in May, 2009, when he received a "foreclosure notice" on the spec townhome on Lot 1. Embry admitted that in November, 2008, he received a title insurance policy on Lot 11 showing an exception for a mortgage to BOI. He assumed, however, that BOI had simply failed to record or provide

---

[3] Embry's deposition testimony is clear that he had full knowledge of BOI'S mortgage well before ETDC made a loan to or took back a mortgage from SMPI. Embry's knowledge is admitted by his direct testimony; there is no need to establish what Embry knew and when he knew it inferentially. Accordingly, the fact of Embry's knowledge is not in material dispute and the finding of fact is a proper one for summary judgment.

13

a release of its mortgage, which he testified was not inconsistent with BOI'S reputation and past practice. When ETDC'S mortgage was recorded in February, 2009, Embry believed that BOI had been paid off via refinancing. Nevertheless, Embry had actual, prior knowledge of BOI'S mortgage. His mistaken belief that it had been released at the time ETDC'S mortgage was recorded does not change that fact.

Embry had actual knowledge of BOI'S mortgage. Thus, there is no need for BOI to rely upon the constructive notice provided by properly recorded instruments.[4] (Even if BOI'S mortgage had been unrecorded, ETDC would still have taken subject to it because of Embry's knowledge of it.) Embry was waiting for SMPI to obtain refinancing so that BOI'S mortgage could be released and replaced by one from Busey Bank or another new lender. His agreement with Shara was that ETDC'S mortgage on Lot 1 would not be recorded until those events occurred. When Shara prepared and signed the mortgage, Embry assumed, without any verification, that BOI had been paid off and replaced by a new lender. Embry's deposition testimony evidences that he did nothing to verify the facts as to BOI'S status. He could have asked for a copy of BOI'S release. He could have called BOI or Busey. He could have ordered a title insurance policy or at least a lien search. He did none of these things. Embry's trust in Shara was, apparently, absolute.

**D. Equity Favors BOI.**

Embry was surprised not by the existence or the recording of BOI'S mortgage, but by Shara's failure to obtain its release. In this regard, BOI is entirely innocent – it never got paid and so had no obligation to release. To the extent that ETDC was led to believe that

---

[4]Since Embry had actual knowledge that BOI held a mortgage on Lot 1, the concept of inquiry notice is not applicable. ETDC'S argument that inquiry notice is precluded where a recorded document is insufficient to constitute constructive notice is moot.

14

BOI'S mortgage had been released, Shara Manning's actions (and implied misrepresentations) were the sole cause of that misinformation. And because of Embry's willingness to trust Shara, ETDC was easily duped. As among ETDC, SMPI and BOI, BOI is the only party free from blame with respect to the events that occurred after BOI recorded its mortgage on August 11, 2008.

While defects in a mortgage instrument are not to be lightly disregarded, there is no causal connection between the alleged defects in BOI'S mortgage and the subordinate position in which ETDC finds itself. Equity aids the vigilant. *Lantz v. C.I.R.*, 607 F.3d 479 (7th Cir. 2010). ETDC is not the kind of innocent purchaser or mortgagee that the conveyancing and recording laws were intended to protect. ETDC had all the knowledge it needed to protect itself, but it failed to exercise due care with respect to its loan to and mortgage from SMPI. ETDC now seeks to avoid the natural consequences of its own negligence by attempting to take advantage of technical defects in the prior mortgage of BOI, where the defects were neither known to nor relied upon by ETDC, and where BOI in no way contributed to ETDC'S mistaken belief. Equity is not on ETDC'S side.

**E. SMPI'S Mortgage to BOI is a Valid Mortgage.**

Of course, if BOI'S mortgage instrument was so far deficient as not to constitute a valid mortgage between BOI and SMPI, the secondary issue of its priority with other creditors would not be reached. In its motion for summary judgment, BOI focuses on the phrase "may be substantially" that appears in section 11 of the Conveyances Act. From this phrase, BOI concludes that use of the statutory form of mortgage is permissive, not mandatory, so that only substantial, rather than strict, compliance with the requirements

15

of section 11 is necessary. BOI contends that the substantial compliance standard does not require a statement of the note's interest rate or maturity date and that the loan amount requirement is satisfied by the statement in paragraph 26 of the mortgage that the amount secured "shall not exceed $455,000," which amount is, in fact, the correct amount of the loan evidenced by the note that the parties intended to be secured by the mortgage. ETDC argues that by omitting the amount of the note in paragraph 3, the maturity date and interest rate, BOI'S mortgage does not substantially comply with the minimum requirements of section 11 so that the mortgage is invalid. The case law does not support ETDC on this issue.

In *Bullock v. Battenhousen,* 108 Ill. 28, 1883 WL 10352 (Ill. 1883), the Illinois Supreme Court held that a recorded trust deed that failed to recite the debt amount was ineffective as constructive notice against a subsequent bona fide purchaser without actual knowledge of the secured debt amount. The court approved the appellate court's reasoning that a recorded mortgage that lacks the specificity to give a subsequent creditor or purchaser constructive notice is nevertheless valid as against the mortgagor and creates a valid lien against the real estate.[5]

*Flexter v. Woomer,* 46 Ill.App.2d 456, 197 N.E.2d 161 (Ill.App. 5 Dist. 1964), holds that a mortgage that omitted the amount of the secured debt and the maturity date, did not provide constructive notice to subsequent purchasers, leaving the mortgagee to depend upon proof that the purchaser had actual notice of the mortgage lien. The absence of the debt amount and maturity date rendered the instrument ineffective as constructive notice

---

[5]*See Battenhausen v. Bullock,* 11 Ill.App. 665, 1882 WL 10693 (Ill.App. 1 Dist. 1882), and that court's discussion of *Gatewood v. House,* 65 Mo. 663, 1877 WL 9208 (Mo. 1877).

16

to third parties, but did not make it invalid *per se*.

Likewise, in *Skach v. Gee,* 137 Ill.App.3d 216, 484 N.E.2d 441 (Ill.App. 1 Dist. 1985), the court rejected purchasers' contention that prior recorded mortgages were void for failing to state the correct amount or due date of the secured debts. The court held that the trial court correctly determined that the mortgages constituted a valid lien on the property, and that the purchasers were estopped from challenging the mortgages because they had actual knowledge of them prior to the purchase.

From these cases, Illinois law is clear that while an error or omission in a recorded mortgage concerning the secured debt amount, maturity date or interest rate, may deprive the mortgagee of the benefit of constructive notice, it does not necessarily invalidate the mortgage. If it can be shown that a subsequent purchaser had prior actual knowledge of the mortgage lien, the defective mortgage remains valid and enforceable against the mortgagor, the property and the subsequent purchaser.

The case law supports the proposition that constructive notice is a more particularized standard than that of actual knowledge. Section 11 of the Conveyances Act is best interpreted as creating a safe harbor for mortgagees. A mortgage that strictly complies with section 11's outline for form and content is "deemed" to be sufficient and valid as against the mortgagor and, once recorded, as to third parties for constructive notice purposes. A mortgagee who deviates from section 11 risks losing that "deemed" or automatic protection from challenges to the efficacy of its mortgage. But the risk that a defective mortgage will be judicially determined not to provide constructive notice to third parties is greater (much more commonly reported in published opinions) than the risk that a mortgage will be determined to be so deficient as to be void *ab initio*. This distinction

17

reflects the fact that a mortgage instrument is a contract between mortgagor and mortgagee that is subject to the rule of liberal enforcement to effectuate the intended agreement, the meeting of the minds, of the contracting parties.

On the other hand, the effect of constructive notice (to the entire universe of third parties) accorded a properly recorded mortgage is more in the nature of a mechanism through which the states regulate the real estate market by setting minimum standards for the form and content of mortgages, deeds, notices of mechanics liens, etc., in order to facilitate certainty of title. So whether a mortgage instrument is substantively sufficient to be valid as against the mortgagor is an entirely different question from whether it is sufficient for constructive notice purposes. ETDC appears to conflate this distinction. Nevertheless, BOI'S mortgage is substantively sufficient so as to be valid as against SMPI. Because of ETDC'S actual knowledge, it is not necessary to determine at this stage whether the mortgage is sufficient for the purpose of providing constructive notice to third parties.

The Court determines that at the time ETDC'S mortgage was prepared, executed and recorded, ETDC had actual notice of BOI'S mortgage. Therefore, ETDC is not a subsequent encumbrancer without notice of BOI'S prior mortgage, and loses this priority dispute. BOI'S motion for summary judgment will be granted to this extent. The issue of the priority of the IRS tax lien is not determined and remains pending.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###